Noah Watkins was convicted for the capital murder-kidnapping of Kathryn P. Clark and sentenced to life imprisonment without parole. On appeal, Watkins argues that his inculpatory statement to Birmingham Police Sergeant Juanita Eaton Evans should not have been admitted into evidence because his mental retardation and limited intelligence prevented him from understanding the Miranda warnings.
The trial judge suppressed the statement Watkins gave to Birmingham Police Sergeant Robert Walker at the city jail at 1:00 o'clock on the morning of April 23, 1984, finding insufficient evidence that Walker understood his Miranda rights and having "heard no testimony relative to whether the defendant understood his rights and knowingly and voluntarily proceeded to make a statement (continued to make a statement)." The judge admitted the statement Watkins gave to Sergeant Evans at 2:20 on the afternoon of April 23, 1984.
In ruling on Watkins' motion to suppress the incriminating statements, the trial judge made findings of fact in two written orders. Those findings are supported by the record and are attached hereto as Appendix I. The trial judge's "summary of evidence re defendant's competency determination" appears as Appendix II.
"When expert testimony indicates that a defendant could have intelligently understood the waiver of his constitutional rights only if they were simply and clearly explained, the record must expressly and specifically establish that such an explanation was given." Hines v. State, 384 So.2d 1171, 1181
(Ala.Cr.App.), cert. denied, 384 So.2d 1184 (Ala. 1980). See also Garrett v. State, 369 So.2d 833 (Ala. 1979).
Watkins is a twenty-one-year-old mildly mentally retarded individual. One expert testified that Watkins' I.Q. was in the "mid fifties"; another stated that it was sixty. Psychiatrist Clifford B. Harden disagreed with Clinical Neuropsychologist Dano Leli's opinion that "it is extremely doubtful that Mr. Watkins could have completely waived his rights after a Miranda warning without the aid of defense counsel." Dr. Harden testified that Watkins could have "done this."
One distinguishing factor of this case is the presence of expert testimony that the accused had attempted to deceive or mislead the experts as to the true state of his mental condition. Dr. Harden testified, "I do not believe we have a good measure of his intelligence. Because, in my opinion, he has been trying to act less intelligent than he is." Psychologist Harry McClaren testified that Watkins "was being manipulative presenting himself in a worse light than was actually the case. * * * In each interview with him, he tried to show himself to be worse off than he was." Even Dr. Leli, who testified as a defense witness, stated that he caught Watson attempting to "fake him out" on at least two occasions.
The evidence of whether or not Watkins could understand theMiranda warnings was conflicting. The trial judge's finding of admissibility "will not be disturbed on appeal unless it is evident that the determination was palpably contrary to the weight of the evidence." Ex parte Singleton, 465 So.2d 443, 445
(Ala. 1985).
 "The standards for appellate review of a trial judge's determination of the admissibility of a confession are as follows: (1) *Page 1155 
The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) `The admissibility of confessions is for the court, their credibility is for the jury.' Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgement. `(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, 347 So.2d 1377
(Ala. 1977) and cases cited therein. `Review of the court's action is limited to determining whether its finding was clearly erroneous.' United States v. Greer, 566 F.2d 472, 473 (5th Cir. 1978)." Williams v. State, 461 So.2d 834, 838 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Williams, 461 So.2d 852 (Ala. 1984).
Applying these principles, we find that Watkins made a knowing and intelligent waiver of his Miranda rights before making an inculpatory statement to Sergeant Evans. The trial judge's written findings are supported by the record. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
 APPENDIX I*
* [Reporter's Note: This appendix is set out verbatim from the record without editing.]
 CC 84-03581 CAPITAL MURDER
ORDER ON SUPPRESSION OF DEFENDANT'S STATEMENT RELATIVE TO THE CAPITAL MURDER OFFENSE (KATHRYN CLARK — DECEASED).
On March 1st, 1985, the undersigned suppressed that portion of defendant's inculpatory statement given to Sgt. Robert Walker of the Birmingham Police Department relative to the non-capital cases pending against defendant — Patti Ingle, prosecutrix.
The court ruling stated `absent testimony re the defendant's comprehension of his rights administered on P. 4 of the statement, the court concludes that the whole of defendant's statement re the non-capital cases is due to be suppressed in the trial of the non-capital cases.'
The State did not further attempt to adduce any testimony re the defendant's comprehension of his rights from Sgt. Walker nor did the State at trial attempt to utilize any statement made by the defendant.
At this writing there has been no testimony relative to defendant's comprehension of Miranda delivered by Sgt. Walker. At page 4 of the `Walker' statement Sgt. Walker mirandizes the defendant and inquires of the defendant, `do you understand these rights I have read you?' The defendant answers `yeah' — and then continues to inculpate himself.
Considering the defendant's mild retardation the court deems that there is insufficient evidence before the court re the defendant's understanding of his constitutional rights more or less `midway' through Walker's statement, thus, defendant's inculpatory statement to Sgt. Walker is suppressed.
However, defendant made a second inculpatory statement to Officer Juanita Eaton *Page 1156 
Evans of the Birmingham Police Department approximately fourteen hours later.
Ms. Evans was called upon to administer a polygraph examination to the defendant for purposes of ascertaining whether or not the defendant had told Walker the truth about where the victim had been `thrown in the water' — efforts to locate the victim had been fruitless.
The court has previously referred to Ms. Evans' testimony in the courts order on defendant's competency, dated February 27, 1985.
The court stated as follows: Juanita Eaton Evans —
Administered a polygraph exam to the defendant on April 23, 1984; talked at length with the defendant, fully "Mirandized" the defendant, became fully acquainted with defendant's "side of the story." Transcript reflects that defendant and Ms. Evans had a full and coherent dialogue for over an hour — discussing, in part, defendant's schooling, job experiences, physical condition, family, etc.
Ms. Evans states that defendant responded to her many questions with specificity or particularity, that, "no, not really", it did not appear to her that the defendant was laboring under a mental problem; that the defendant did not exhibit any kind of bizarre behavior.
Further, that she felt defendant knew right from wrong and gave ample evidence based on defendant's statements to support her opinion; that only after defendant stated that he had been to special schools did it occur to her that defendant may have some type of learning disability.
Ms. Evans' testimony is the most instructive lay testimony on the subject of defendant's competency and unequivocally supports the proposition that the defendant was competent at time and occasion of the polygraph.
Ms. Evans' testimony is just as instructive re comprehension and waiver of Miranda as it was re defendant's competency.
Ms. Evans stated that she talked to the defendant for over an hour prior to the polygraph, that she gave the defendant a copy of Miranda and read same to him, that she stood over him and `we read the same copy', that defendant signed the waiver, that defendant responded to her questions, that she asked defendant if he understood his rights and that he stated that he did, that she did not induce him to make a statement or threaten him in any way; further, that the witness explained the polygraph `consent form' to the defendant, that defendant signed this form; further, the record reflects that witness and defendant had a lengthy and lucid dialogue relative to defendant's background, family history, education, job experiences, etc.
Defendant answered the several questions with particularity and specificity; that defendant did not exhibit any kind of bizzare behavior during the interview and `no, not really', did it appear that defendant was laboring under some kind of mental problem.
Defendant goes on to make a detailed statement to Ms. Evans regarding his activities with the deceased.
Anyone reviewing the court's findings on the admissability of the `Juanita Evans' statement should read Ms. Evans entire testimony at the January 11, 1985, Suppression Hearing — pages 67-100. [Transcript pp. 81-111].
Could defendant, who is classified as mildly retarded, understand and appreciate Miranda and intelligently and voluntarily relinquish his rights?
Please see attached copies of Courts Determination re defendant's competency to stand trial and Summary of Evidence re defendant's competency Determination.
Obviously, a determination of competency for trial purposes is not controlling on the `waiver' question, yet the competency findings are in part, instructive.
On February 14, 1985, the Court ordered defendant to be transported to Taylor Hardin for the express purpose of assessing whether or not defendant could, at the time of his arrest, have understood and intelligently waived Miranda.
A hearing was conducted on February 27, 1985, wherein defendantis court appointed psychologist and two doctors from Taylor Hardin testified. *Page 1157 
Defendant's expert, Dr. Leli, a psychologist, testified that `overall defendant was in the upper range of the trainable or moderate range of mental retardation' — page 16.
Dr. Leli stated that defendant's I.Q. was in the mid fifties but that the test score could vary a few points — but by not more than ten points in the absence of some `neurologic insult or some kind of acute psychological or psychiatric disorder.'
Dr. Leli stated that defendant was `minimally competent' to stand trial dependant on his on going trusting relationship with his lawyer.
Dr. Leli felt that defendant understood the nature of the charges against him and the possible penalty.
When asked by defense counsel if the defendant could have conceptually understood the right to remain silent (page 23), that anything you say can and will be used against you in a court of law (page 24), you have the right to an attorney or a lawyer (page 24), if you cannot afford a lawyer the court will appoint one for you (page 25).
Dr. Leli responded that in effect defendant would have either difficulty or considerable difficulty understanding these statements, depending in part on the care utilized by the police officer in simplifying the language.
Dr. Hardin's testimony coupled with Dr. McClaren's testimony on the subject of defendant being able to understand Miranda, plus the defendant's prior exposure to Miranda by way of Officer Frew at the point of arrest, the Robert Walker `Miranda' some fourteen hours earlier and the excellent Miranda colloquy between defendant and Officer Juanita Evans leads the undersigned to the firm conclusion that the defendant understood and intelligently waived his Miranda rights.
Additionally, the Court observes that this defendant has had previous experience as a defendant in the `system' — having plead guilty to two burglary offenses in 1982.
Defendant urges that Sgt. Walker induced him to make his original inculpatory statement thus tainting the second inculpatory statement to Ms. Evans.
In short, Walker tells Watkins that `if she dies you will have a murder beat; that perhaps he can help' Watkins by finding the woman and getting her to the hospital before she bleeds to death.
At the moment Walker is trying to ascertain where the victim was deposited so that life saving efforts can be initiated if the victim is alive.
Certainly Walker's interrogation techniques fell far short of the officers physical abuse of a suspect employed in order to get the suspect to reveal the victim's whereabouts in Leon vs.State, 410 So.2d 201.
The Court stating "the elimination of any causative effect of the coercion is shown also by the more commonly discussed elements that a complete set of Miranda warnings was meticulously given, understood, and waived before the subsequent statements; that over five hours transpired between the violence and the formalization of those statements; and that the confessions were secured by entirely different officers than those who employed the coercive tactics."
Of course, in our case there was a fourteen hour break between Watkins statement and the Evans statement, as stated Ms. Evans meticulously administered the Miranda warnings to Watkins with absolutely no coercive tactics being employed.
In conclusion, the `Walker' statement is suppressed and the Evans' statement shall be admissable.
DONE AND ORDERED this 3rd day of May, 1985.
 /s/ James H. Hard
James H. Hard, Circuit Judge
 APPENDIX II*
* [Reporter's Note: This appendix is set out verbatim from the record without editing.]
 SUMMARY OF EVIDENCE RE DEFENDANT'S COMPETENCY DETERMINATION
Suppression Hearing
January 11, 1985 *Page 1158 
Sgt. Walker — Testified at length re his activities in the case. At no time does Walker suggest that he had a problem talking with the defendant or that the defendant had a problem comprehending Walker's questions. Walker testified that at no time did defendant's demeanor or tone of voice raise a question as to the defendant's competency.
Eight page transcript of defendant's statement to Walker reveals lucid, on going dialogue between defendant and Walker.
Juanita Eaton Evans — Administered a polygraph exam to the defendant on April 23, 1984; talked at length with the defendant, fully "Mirandized" the defendant, became fully acquainted with defendant's "side of the story." Transcript reflects that defendant and Ms. Evans had a full and coherent dialogue for over an hour — discussing, in part, defendant's schooling, job experiences, physical condition, family, etc.
Ms. Eaton states that defendant responded to her many questions with specificity or particularity, that, "no, not really", it did not appear to her that the defendant was laboring under a mental problem; that the defendant did not exhibit any kind of bizarre behavior.
Further, that she felt defendant knew right from wrong and gave ample evidence based on defendant's statements to support her opinion; that only after defendant stated that he had been to special schools did it occur to her that defendant may have some type of learning disability.
Ms. Evans' testimony is the most instructive lay testimony on the subject of defendant's competency and unequivocally supports the proposition that the defendant was competent at time and occasion of the polygraph.
Ms. Cheryl Simonetti, one of defendant's attorneys — states that in her opinion, defendant could not have understood Miranda and in effect that defendant cannot adequately assist in his defense.
Deposition of Curtis Jordan, co-defendant — Curtis Jordan, deposed on February 7, 1985, testified as to defendant's words and conduct on the occasion of the alleged criminal activities supportive of the indictments. Jordan states he has known defendant "off and on" for six months; that, "I might say he probably ain't too smart in reading or something like that, but I don't think he is mentally retarded or nothing like that."
Second PhaseSuppression Hearing
February 27, 1985
Dano Leli, Ph.D., defendant's court appointed psychologist — testified that defendant was minimally competent to stand trial as long as defendant continued to enjoy the trusting relationship between him and his lawyers; that defendant was not nor was he ever psychotic or mentally ill and that defendant probably could not have competently waived Miranda without the aid of an attorney.
Further, that the defendant understood the charges and possible penalties, that defendant was able to communicate with his attorneys within the limits posed by his impaired intellectual functioning — the "upper" regions of mild retardation.
Dr. Leli concludes in his report (attached) that defendant was stable and required no "acute need for psychological or psychiatric intervention."
Dr. Leli's testimony is entirely supportive of the proposition that the defendant is currently competent for trial purposes. (Dr. Leli's report attached.)
Clifford Harden — Dr. Harden, head psychiatric M.D. at Taylor Hardin is adamant that defendant is competent for trial.
Dr. Harden and Dr. McClaren have known the defendant more intimately than any other witness — the defendant having been at Taylor Hardin for a lunacy evaluation and staying about three months.
Dr. Harden's expert testimony is very instructive and compelling for the proposition that defendant is competent for trial.
Defendant was also seen by Drs. Harden and McClaren on February 21, 1985 on an "out patient" basis and again, among other findings such as that defendant could have *Page 1159 
understood and intelligently waived Miranda, were of the opinion that defendant was ready to move forward in the trial process and the doctors recommended that the cases move towards disposition.
Harry McClaren, Ph.D., from Taylor Hardin, was just as adamant as Dr. Harden re defendant's competency to stand trial. The record of the proceedings will best support their opinions. Suffice it to say that neither Harden or McClaren equivocated one iota from their well informed and staunch position that defendant was competent for trial.
(Copies of lunacy findings and 2/21/85 report are attached.)
Mrs. Watkins, defendant's mother. Mrs. Watkins' testimony was consistent with the proposition that defendant was competent for trial from the perspective that she said nothing to adequately support the contrary. She did state that her son was easily lead, yet that he was a leader, that he had been to several schools, that she had taught him right from wrong and that he knows right from wrong.
The court has attempted to summarize in a "fact finding" fashion only some of the reasons the court deems that this defendant is competent for trial.
Out of all the evidence adduced on the competency question the only testimony that arguably supports the proposition that defendant may not be competent was the testimony of one of defendant's attorneys — which was basically addressed to the attorneys opinion that defendant could not understand Miranda.
Counsel's assertions, in the face of all the other testimony — two police officers, defendant's co-defendant and three experts plus the court's consideration of the vast medical records secured by the court, the court's first hand observation of the defendant, who has been present at all court proceedings — leads the court to the firm conviction that this defendant is competent for trial.
Construing the whole evidence in its light most favorable to the defendant, the court concludes that no doubt exists in the court's mind that this defendant is competent for trial, that it would be frivolous to impanel a jury to again assess the overwhelming evidence supportive of a competency finding.
 /s/ James H. Hard
James H. Hard, Circuit Judge
[EDITORS' NOTE: PAGE 1160 CONTAINED DECISIONS WITHOUT OPINIONS.]
 *Page 1